## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| PORTIA ADAMSON, on behalf of herself and all others similarly situated,           Plaintiff,       v. <br><br> VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, d/b/a AUDI OF AMERICA, INC., VOLKSWAGEN AG, a German corporation, and AUDI COLORADO SPRINGS, on behalf of itself and all others similarly situated,           Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) **Civil Action No.:** <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Portia Adamson ("Plaintiff" or "Ms. Adamson"), on behalf of herself and others similarly situated, by and through her undersigned counsel, hereby files this Class Action Complaint against Defendants, alleging upon information and belief, except as to facts and matters that relate to Plaintiff, which are alleged upon knowledge and belief, as follows:

## I. NATURE OF ACTION

1.      This is a Class Action for damages and declaratory relief based on the Defendants' Nationwide violations of the Federal Sherman Antitrust Act, (15 U.S.C. §§ 1-7).

2.      Defendants consist of two or more distinct actors pursuing their own separate economic interests.

3.      Defendants, in violation of the Sherman Antitrust Act and as outlined below, have acted in concert to restrict the entry of off-lease Audi automobiles into the free, open used car market by refusing to provide payoff figures to Lessees of those automobiles and by also refusing to accept third-party funds on behalf of a Lessee once a payoff figure is obtained.

1

4.      Volkswagen Group of America, Inc. d/b/a Audi of America, Inc. and Volkswagen AG are German manufacturers of new vehicles for export in the United States of America.

5.      Defendant Audi Colorado Springs – like the other members of the proposed Defendant Class – is a franchised dealership that has exclusive rights to market, sell, and service new Audis under warranty.

6.      Defendant Audi Colorado Springs – like other members of the proposed Defendant Class – *also* has the exclusive right to take possession of, and market, leased Audi's that are being returned and/or traded in early.

7.      Defendants' concerted action restricts used Audis' entry into the open, free market, and, as outlined below, unreasonably restrains trade, affecting both interstate and foreign commerce.

8.      Plaintiff, like all others similarly situated, has been injured because of the Defendants' actions.

9.      Pursuant to 15 U.S. Code § 15 - Suits by persons injured, Plaintiff seeks, on behalf of herself and all others similarly situated, "threefold the damages sustained. . . . ., and the cost of suit, including a reasonable attorney's fee" (Id.).

10.     This is the matter before the Court.

## II. JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action and the claims alleged herein pursuant to 28 U.S.C. § 1331 as there is original federal jurisdiction over the claims asserted under the Sherman Antitrust Act, (15 U.S.C. §§ 1-7).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that the conduct giving rise to this action occurred in this District, Defendants regularly conduct business in this District,

and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## III. <u>PARTIES</u>

### *Proposed Representative Plaintiff*

13.    Plaintiff, Portia Adamson, is a citizen of the State of Colorado and an adult individual who currently resides at 9819 Granite Park Lane, Peyton, CO 80831.

14.    On or about October 18, 2019, Plaintiff entered into a Motor Vehicle Sales Agreement ("MVSA") for the lease of a 2019 Audi A5 Sportback 45 TFSI (2.0T) quattro.

15.    Plaintiff has standing pursuant to 15 U.S. Code § 15 to enforce federal law as she suffers actual injury from the complained of behavior that has remedies at law.

### *The Volkswagen Defendants*

16.    Defendant, Volkswagen AG, is a German corporation with its principal place of business in Wolfsburg, Germany. Volkswagen AG is one of the largest automobile manufacturers in the world and is in the business of designing, developing, manufacturing, and selling automobiles. Volkswagen AG is the parent of Defendant Volkswagen Group of America, Inc. and Audi. In 2020 Volkswagen AG was the largest automobile manufacturer in the world.

17.    During the Class Period, *infra*, Volkswagen AG was continuously doing business through a chain of distributors and dealers in the United States, including within this District, by advertising, promoting, distributing, selling, and leasing Volkswagen cars.

18.    Defendant Volkswagen Group of America, Inc. ("VW America", and, together with Volkswagen AG, "Volkswagen" or the "Volkswagen Defendants") is a New Jersey corporation with its principal place of business in Herndon, Virginia. VW America conducts business in all States and the District of Columbia. During the Class Period, VW America advertised, promoted,

distributed, sold, and leased certain vehicles at issue in this Complaint throughout the United States, including in this District.

19.     The Volkswagen Defendants financed, leased, designed, and sold the vehicles at issue in this action specifically for sale in the United States.

***Audi Colorado Springs, Proposed Defendant Class Representative***

20.     Audi Colorado Springs ("ACS") is a franchised Audi dealership, licensed to sell both new and used cars in the State of Colorado.

21.     ACS operates and transacts business in the State of Colorado and the acts complained of occurred in the State of Colorado.

22.     Audi currently has 304 dealers operating in 285 cities across all fifty (50) states.

23.     ACS and most Audi dealerships nationwide, if not all, knowingly conspired with the Volkswagen Defendants to restrain lease buyouts in exchange for various financial incentives and, in the words of the Audi Dealer Council President, "jack up profits for the short term", (*infra*).

24.     ACS, therefore, pursuant to Federal Rule of Civil Procedure 23(a), is properly designated the Representative Defendant of each Audi dealership nationwide who participated in (a) Audi's marketing programs aimed at Lessees encouraging them to return to their Audi dealership prior to their lease expiration to trade up into a new Audi and (b) its Certified used vehicle program (herein the "Audi Dealership Defendant Class" or "ADDC").

## IV. <u>FACTUAL PREDICATES LEADING TO SUIT</u>

25.    The Volkswagen Defendant sells new cars wholesale to Defendant ACS and other members of the ADDC.

26.    Defendant ACS and the ADDC then sell the cars with a markup.

27.    However, dealers do not sell every car they buy from the manufacturer. Instead, they also offer lease options to consumers.

28.    Audi has historically relied heavily on its leasing programs to "sell" its new vehicles. In 2019, based upon its' 2019 Annual Report, an estimated 75% of all new Audis "sold" were leased vehicles.

29.    To enter a lease, as Ms. Adamson did herein, the customer signs a Purchase Agreement with the dealer and then a lease agreement with the manufacturer's captive finance company.

30.    The Purchase Agreement contains what is called the Capitalized Cost ("Cap Cost"). The Cap Cost is the price at which the dealership is "selling" the vehicle to the consumer.

31.    Once the Cap Cost is established, the dealership finance department subtracts the Residual value (the amount that the Manufacturer believes the vehicle will be worth at the end of the lease term), and calculates/adds in fees, taxes, and interest to come up with a monthly payment amount.

32.    A captive finance company is a financing entity owned, operated, and controlled by the manufacturer (herein, the Volkswagen Defendants).

33.    Its sole function is to (1) facilitate sales[1] by (2) servicing the dealers in the form of a floorplan (financing of inventory) and, as is pertinent here, (3) offering various incentives to the

---

[1] https://www.autonews.com/finance-insurance/captive-finance-companies-boost-auto-sales-during-pandemic

dealer class to enforce their Policy of purchasing off-lease vehicles at the below wholesale market value prices versus those disclosed at inception pursuant to law. (*infra*).

34.     With a lease, the vehicle leaves the dealer's books and lands on the captive finance company's books because the dealer sells the car back to a subsidiary of the manufacturer and the lessee contracts to use it for a set period of time.

35.     Defendants' standard, uniform lease affords the lessee an option to purchase the leased vehicle by paying to the finance company a set amount of money, outlined and agreed upon at the outset of the lease - the buyout price.

36.     As is disclosed on the lease itself, Defendants charge $450.00 for this option.

37.     There are two buyout prices contained in Audi's uniform lease, (1) for early termination – as is at issue herein – and (2) for purchase at the end of a lease term.

38.     The "early termination" price, by law (*discussed infra*), is required to be predetermined and disclosed at the inception of the lease (additional mileage and/or abnormal wear and tear charges excluded), and, therefore, is to be easily calculable prior to lease execution.

39.     In or about September of 2021, the Defendant manufacturers – in conjunction with members of the ADDC and to "jack up short-term profits" – implemented a strict nationwide policy of refusing to give payoffs to anyone other than one of their dealerships, and of not honoring third-party payoff funds.

40.     Citing amorphous "legal and regulatory requirements," Defendants' financial portal informs lessees that to obtain a payoff they must go to a franchised dealership.

41.    Although the standard lease states that: "*You* have the option to buy the Vehicle at any time. . . .", this is misleading because even with a third-party conduit, the title will be issued in the lessee's name.

42.    Nowhere within the lease's applicable buyout clause is there any restriction on the use of third-party funds to close this transaction, nor is there any prohibition of subsequent assignment of title.

43.    When a lessee trades or sells the vehicle to a third-party, the lessee signs an Assignment of Title because the buyout is required to be in lessee's name.

44.    Once the title is issued in the lessee's name, all obligations, rights, entitlements and the like are contained within the four corners of that title, and do not contain any restrictions on assignment.

45.    The vehicle is then held in the lessee's name until such time as it is resold.

46.    When the vehicle is sold, the assigned title is submitted to the appropriate state authorities and retitled in the new purchaser's name.

47.    For those who can/could provide a source of personal funds to buyout the lease and obtain ownership of the vehicle to sell or trade at a third-party dealership, they are/were subjected to double taxation and fees – on average $2,500-3,000 – in that they could not use the value of their vehicle to offset the cost of a new vehicle and, therefore, only pay taxes for one transaction versus two.

48.    Lessees, like Ms. Adamson, who cannot "front" the buyout from personal funds are deprived from participating in the open, free market of the vehicles and the benefit of the equity,

"appreciation[2]" they have in their leases, or do the economically irrational thing and sell their vehicles at an artificially low price (on average $3,000 below Manheim Wholesale value).

***Ms. Adamson's Experience***

49.     On October 18, 2019, Ms. Adamson entered into a Motor Vehicle Sales Agreement for the Lease of a 2019 Audi, A5 Sportback 45 TFSI (2.0T) quattro.

50.     A lease is not a purchase, instead the lessee finances a percentage of the vehicle's Cap Cost, *supra*, over a set period.

51.     A dealer sets a Cap Cost (the purchase price of the vehicle) and subtracts a Residual (the value that the manufacturer estimates the vehicle will be worth at the end of the lease term), adds certain fees, and divides the balance over the term of the lease and multiplies it by the interest rate charged to derive a monthly payment.

52.     In the current economy, Ms. Adamson (and all others similarly situated) have gained significant equity in their leases because the value of their vehicles on the open, free market far exceeds their defined Early Termination Buyout price (the Residual Value plus defined payments, fees, and taxes attributable to the early termination).

53.     Aware that the equity in her lease was high, that the value of her lease had "appreciated", and after solicitation by defendant ACS and Audi of North America that they wanted to trade her vehicle in on another Audi. Plaintiff, at ACS's request, went into ACS to inquire about it buying out her lease and/or giving her a fair trade on a new Audi.

---

[2] https://www.autonews.com/finance-insurance/lease-appreciation-tool-dealerships

54.     When Plaintiff inquired of Defendant ACS about her options, she learned that Defendants would not allow third party funds to purchase and/or buy out her lease and that Defendants would only allow an Audi dealership to buy out the lease.

55.     Subsequently, Ms. Adamson logged onto her on-line account with Audi and attempted to ascertain what her current buyout price was by pressing a button denoted "Payoff". Through a hard block in the system, she was advised that "legal and regulatory issues" prevent her from obtaining this number. Instead, she was directed to go to the dealership.

56.     Ms. Adamson was left with only one method to exercise her option – to sell it to Defendant ACS for an amount that was $3,000 below average wholesale value as reported by Manheim.

***There is No Lawful Basis to Prohibit Use of Third-Party Funds***

57.     Defendants' uniform Lease reads as follows:

> (e). Option to Purchase Vehicle. You have the option to buy the Vehicle at any time from a party designated by us. If you do, you agree to re-register and re-title the vehicle in your name no later than thirty days from the time you purchase it. If you fail to do so, we reserve the right to cancel the registration. Before the scheduled lease end, the price will be the Adjusted Lease Balance (see item 20) plus the item 9 Purchase Price minus the item 70 Residual Value. At the scheduled lease end, the price will be the item 9 purchase price. At either time, you must also pay the Additional Amounts Due and we will apply the Addition Credits to the amount you owe (see item 25). Under this Lease, you will only be considered to have purchased the Vehicle if we assign the Vehicle's title directly to you.

58.     Even with the use of third-party funds, the vehicle's title will be processed and returned in the lessee's name to ensure the proper sales tax has been remitted.

59.     Nowhere contained therein is there anything which restricts the lessee's use of third-party funds to exercise this option.

60.     Nowhere contained therein is there anything that restricts a lessee's subsequent assignment of title.

61.     Nowhere within the four corners of an issued title is there any restriction on subsequent assignment of title.

***Defendants' Policy is Unreasonable Under the Consumer Leasing Act, Reg. M.***
***(15 U.S.C §§ 1667 a and b.)***

62.     The Consumer Leasing Act (15 USC 1667, *et seq*.) (the "CLA") was passed in 1976 to assure that meaningful and accurate disclosure of lease terms are provided to consumers before entering a contract. It applies to consumer leases of personal property and was aimed to allow comparison of one lease with another, as well as to compare the cost of leasing with the cost of buying on credit or the opportunity cost of paying cash. In addition, the CLA puts limits on balloon payments sometimes due at the end of a lease and regulates advertising.

63.     Pursuant to 15 U.S.C. § 1667 – Definitions, Ms. Adamson is a "lessee", who entered into a consumer lease with Audi's captive financial arm.

64.     Defendants are "persons" as defined under law and joined in their concerted and conspiratorial scheme through the elimination of third-party funding of buyouts to maximize the profitability of both their branded dealerships (such as Defendant ACS) and their captive financing affiliates.

65.     A captive finance company is a wholly-owned subsidiary of a manufacturer – Audi of North America in this instance – whose sole purpose is to serve its manufacturer.

66.     Pursuant to 15 U.S.C § 1667a – Consumer lease disclosures, Defendants were required to provide very specific disclosures at the inception of a lease:

Each lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:

\*       \*       \*

(4) The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;

(5) A statement of the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term and whether or not the lessee has the option to purchase the leased property and at what price and time;

\*       \*       \*

(9) The number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments;

(10) Where the lease provides that the lessee shall be liable for the anticipated fair market value of the property on expiration of the lease, the fair market value of the property at the inception of the lease, the aggregate cost of the lease on expiration, and the differential between them; and

(11) A statement of the conditions under which the lessee or lessor may terminate the lease prior to the end of the term and the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination.

(Pub. L. 90–321, title I, § 182, as added Pub. L. 94–240, § 3, Mar. 23, 1976, 90 Stat. 258;

amended Pub. L. 111–203, title X, § 1100A(2), (10)(B), July 21, 2010, 124 Stat. 2107, 2109).

67.     The restrictions Defendants have placed on Ms. Adamson, and all others similarly situated, are undisclosed penalties and fees in violation of these statutory disclosure requirements.

68.     Defendants agreed, by words or conduct, to accomplish the unlawful goal of unreasonably restraining trade in the manufacturer's leased cars, to deny lessees the value of their lease appreciation, equity, and, to ensure that Defendant ACS and other members of the

ADDS would reap excess gains by manipulating the price a lessee could obtain for a lease buyout.

69.     Defendants agreed, by words or conduct, to accomplish the unlawful goal of implementing an undisclosed fee for early lease termination in violation of Regulation M and this usurping lessee equity/appreciation to record profits for both manufacturer and dealer.

70.     Defendants acted to accomplish this unlawful goal by eliminating the use of third-party funds for buyouts of leased cars midway through their lease terms.

71.     At the outset, Defendants were required to plainly disclose – in their standard and uniform lease – that they would not allow lessees like Ms. Adamson to exercise the buyout option at the set discernable inception price when used car prices rose to a level intolerable to the Defendants.

***Defendants' Illegal Conspiracy to Price Fix and Manipulate the Market***

72.     Defendants have conspired to manipulate the market for Defendant manufacturers' used cars by restricting the entry of these vehicles into the free, open market and did so to usurp the equity their lessees have in their leases.

73.     As was outlined in Automotive News, the automobile industry's leading news source, Dealerships are "grounding" off-lease vehicles[3], purchasing them to sell to other customers at an unprecedented level to offset a purported "scarcity" in used-vehicle inventory.

---

[3] https://www.autonews.com/finance-insurance/lease-appreciation-tool-dealerships.

*Class Effects of Restricting Third Party Funding of Buyouts*

74.    Defendants concerted action manipulates prices realized by lessees exercising their buyout option to below fair market value and deprives those lessees who cannot provide proof of personal funds the financial benefit of the equity and appreciated value of their leases.

75.    The crux of Ms. Adamson's complaint is that the Defendants conspired (mid-stream) to eliminate her ability to freely market her vehicle to realize the value between the vehicle's fair market value and her set early termination buyout option.

76.    This scheme unreasonably fixes prices in a way that lessees are deprived of the equity in their lease in favor of fattening dealer profit margins with a ready supply of used cars purchased at fixed prices.

77.    This practice also reduces the supply of used cars in the free market by disincentivizing lessees from doing the economically rational thing and exercising the purchase option for a profit and, thus, artificially increases the prices of the Defendant manufacturers' used vehicles.

78.    This practice benefits members of the ADDC by allowing them to buy low, for a fixed price, and then sell high at an inflated fair market value.

79.    Defendants' scheme has also cost those who could provide personal funds and buyout the vehicles thousands in additional costs they otherwise would not have had to pay if allowed to simply trade them with a third-party.

80.    Defendants' scheme has caused lessees who cannot provide funds to purchase the vehicle to either (a) sit out this market, thus keeping their vehicle out of it, or (b) trade the vehicle for an average of $3,000 under Manheim wholesale value.

### The Overall Market Effect of Restricting Third Party Funding of Buyouts

81.     Defendants' conspiratorial acts are denying lessees' the right to capitalize on their lease equity and "grounding" them to Defendants' dealerships, thereby artificially deflating the value of their lessees' equity.

82.     As for those persons looking to purchase a used vehicle manufactured by the Defendants, Defendants' conspiratorial conduct is artificially increasing the price of these vehicles on the open, free market because they are shut out of purchasing them and, therefore, not part of a "record" market of inventory used car superstores have been reporting.

83.     Therefore, those persons shopping for a used VW or Audi vehicle, are paying higher prices than if the market was not restricted.

84.     In sum, the overall market effect is that Plaintiff, and those similarly situated, can either sit this market out thereby further diminishing the supply of these used vehicles, or, take less than market value. In doing so, class members incure money damages, while the ADDC dealerships, using incentives provided by Defendant Manufacturers, reap whirlwind profits by selling the vehicles at fair market value – all because of market restrictions they imposed.

85.     When Defendant manufacturers obstruct a lessee's ability to exercise an early buyout option by instructing their captive finance company to forbid third party funding of buyouts, they are acting in an anticompetitive way.

86.     When Dealers, such as ACS herein and members of the ADDC, accept incentives from the Defendant manufacturers to purchase these vehicles at a fixed price and then to resell them for prices inflated by the restrictions Defendants have placed on the paid for buyout options, they

are acting in an anticompetitive way to "jack up" their profits for the "short term" at the expense of Plaintiff and other class members.

87.     When Defendant manufacturers obstruct a lessee's ability to exercise an early buyout option by instructing their captive finance company to forbid third-party funding of buyouts, they are imposing an undisclosed termination fee in violation of Regulation M, discussed *supra*.

88.     Instead of letting the free market work, Defendant manufacturers have conspired with their national dealer network to:

> a.   suppress the price dealers pay for leased cars,
>
> b.   compel lessees to either trade low or to wait until the end of their lease term to either exercise it at that time or let their buyout option expire worthless, returning the car at lease-end,
>
> c.   cost lessees who could prove personal funds thousands in additional costs, and
>
> d.   provide the manufacturer lingering control over who is marketing the cars it manufactured by channeling their used vehicles exclusively to their franchised dealerships.

89.     Because only a franchised dealership can exercise the buyout, it discourages most lessees who do not have proof of personal funds from capitalizing on the equity they have in their lease.

90.     The net effect of this artificially depresses the value of that purchase option for all lessees without the ability to produce proof of personal funds and eliminates fair competition for those used cars.

91.     For those who can provide personal funds and exercise this option, it has cost them thousands in costs they otherwise would not have had to expend.

92.     This is in violation of federal law as outlined below because it is a conspiracy to place an unreasonable restraint on trade in the manufacturer's used cars.

*Predicate Liability Under the Sherman Act*

93.    The Defendants refusal to allow third-party funding of a lessee fixes the prices realized by lessees exercising their buyout option to below market value.

94.    Defendants' actions impose unreasonable penalties and fees for early termination in violation of The Consumer Leasing Act (15 U.S.C. § 1667, *et seq*.) as prior to September 2021, Defendants engaged in decades-long course of dealing ("Policy") allowing lessees to have their buyout option funded by a third-party, (a) thereby saving the lessee from sales tax and associated fees and (b) allowing lessee to realize the price appreciation of the vehicle between fair market value and the price of the buyout option.

95.    The net effect of Defendants' Policy change is to (i) artificially deflate the value of these vehicles; (ii) artificially inflate the value of their off-lease vehicles in the open, free market by restricting their leased vehicles access to third-party dealerships;  (iii) usurp lessees' equity in their leases by restricting third-party funding of buyouts, and (iv) prevent these highly desired vehicles from participating in the open, free market for the Defendants' vehicles.

96.    Defendants have publicly admitted that "grounding" – restricting these vehicles to their branded dealerships – has allowed them to report record profits on far fewer sales[4].

97.    It is indisputable that Defendants' Policy shift was intentionally orchestrated between the manufacturers and their dealerships to exploit the current market[5].

---

[4] https://www.autonews.com/finance-insurance/lease-appreciation-tool-dealerships
[5] https://www.autonews.com/finance-insurance/captive-finance-companies-boost-auto-sales-during-pandemic;. https://www.autonews.com/finance-insurance/lease-appreciation-tool-dealerships; https://www.autonews.com/used-cars/amid-inventory-woes-policies-favor-franchised-dealers; https://www.autonews.com/dealers/3-public-car-dealership-groups-hit-record-new-vehicle-profits; https://www.autonews.com/dealers/penske-automotive-doubles-down-used-vehicle-supercenters-q4-net-income-surges; https://www.autonews.com/automakers-suppliers/vw-raises-full-year-outlook-warns-growing-chip-shortage.

98.    In the words of the Audis Dealer Advisory Council's Chairman, the dealers and

Audi/VW worked together through the Pandemic to "jack up profitability in the short term[6]".

99.    Defendant ACS – along with the rest of the ADDC – is reaping record profits due to the

manipulated second tier of the market – the market for off-lease Audis.

100.    As this Policy is standard, uniform and enforced nationwide against all Audi Lessee's

from a centralized location, it plainly affects and involves interstate commerce.

101.    The plain effects of Defendants' actions on Ms. Adamson and others similarly situated

are violations of federal consumer law – the Consumer Leasing Act, Reg. M – 15 U.S.C §§ 1667

a and b, *infra*.

## V. <u>CLASS ACTION ALLEGATIONS</u>

### *The Plaintiff Class*

102.    Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil

Procedure on behalf of the following class:

> All consumer lessees of vehicle manufactured by the Defendant manufacturers who
> entered into the lease in the United States between October 18, 2019 through current day
> who could not realize the fair market value of their buyout option and those who were
> able realize the fair market value of their buyout option but who incurred additional costs
> related to retitling the vehicle in their name immediately before resale.

(Collectively, the "Class").

103.    The Class is so numerous that joinder of all members is impracticable. Although the size

of the Class (and any separate classes or sub-classes that may be appropriate under Fed. R. Civ.

---

[6] https://www.autonews.com/dealers/audi-could-make-it-simpler-dealers.  Mr. Flow goes on to describe
how the Pandemic and supply issues have been exploited by Defendant Manufacturers and their
dealerships to generate "great profitability for Audi dealers — something they've struggled with
extensively in recent years." Id.

P. 23(c)(5)) is presently unknown to Plaintiff, this information is easily obtainable from Defendants, who have it in their exclusive possession. Based on preliminary discovery, it is estimated that the Class consists of more than a hundred thousand consumers nationally.

104.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members including:

      1.   The identity of the participants of the alleged conspiracy and their roles in implementing the scheme;

      2.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

      3.   Whether the alleged conspiracy and its overt acts violated the federal Sherman Antitrust Act by conspiring to unreasonably restrain the trade in of the Defendant manufacturer's used cars (15 §§ U.S.C. 1-7);

      4.   Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and the members of the Class by depriving them of an opportunity to cash in on their leases' appreciation without having to suffer financial hardship or unnecessary inconvenience in acquiring said vehicles for specified amounts;

      5.   Whether the conduct of the Defendants and their co-conspirators, as alleged in the complaint, has cost those who could prove source of funds thousands in duplicative costs; and,

      6.   The appropriate class-wide measure of damages for the Classes.

105.    Plaintiff's claims are typical of the claims of the Class, which all arise from the same operative facts and are based on the same legal theories.

106.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to vigorously litigating this matter. Further, Plaintiff has retained counsel who are highly experienced in handling class actions, particularly consumer class actions.

107.    Neither Plaintiff nor her counsel have any interests which conflict with or are antagonistic to those of the Class or which might cause them to not vigorously pursue this action.

108.    This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing any Class, as well as a risk of adjudication with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impede or impair their ability to protect their interests.

109.    A class action is a superior method for the fair and efficient adjudication of this controversy. The interests of Class members in individually controlling the prosecution of separate claims against Defendants is small given the small amount of the actual damages at issue for each Class member, but which in the aggregate are estimated to involve millions of dollars. Management of the action as a class action is likely to present significantly fewer difficulties than those presented by any assertion of many individual claims. The identities of Class members can easily be obtained from Defendants' computerized and electronic records.

*The Defendant Class*

110.    Audi of Colorado Springs – and most, if not all, of Audi's 304 dealers operating in 285 cities across 50 states, knowingly conspired with the manufacturing defendants to restrain lease buyouts in exchange for various financial incentives and to, in the words of their Dealer Council President, "jack up profits for the short term."[7]

---

[7] https://www.autonews.com/dealers/audi-could-make-it-simpler-dealers.

111.   Plaintiff also seeks certification of a defendant class action under Rule 23(a) of the

Federal Rules of Civil Procedure as follows:

> Each Audi dealership - out of the 304 dealers operating in 285 cities across all of the United States forty-eight (48) states and two (2) Commonwealths ("50 states), who conspired with the manufacturing defendants to restrain lease buyouts in exchange for various financial incentives and to, in the words of their Dealer Council President, "jack up profits for the short term." (Collectively, the "Class").

112.   The Class is so numerous that joinder of all members is impracticable.   A specific

identification of each of the 304 Audi dealers who participated in the subject scheme is within

the Defendant Manufacture's sole custody and control, and available with keystrokes.

113.   There are questions of law and fact common to the Class that predominate over any

questions affecting only individual Class members including:

> 1.   The identity of the participants of the alleged conspiracy and their roles in implementing the scheme;
>
> 2.   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;
>
> 3.   Whether the alleged conspiracy and its overt acts violated the federal Sherman Antitrust Act by conspiring to unreasonably restrain the trade in of used cars (15 §§ U.S.C. 1-7);
>
> 4.   Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiff and the members of the Class by depriving them of an opportunity to capitalize on their lease appreciation without having to suffer financial hardship or unnecessary inconvenience in acquiring said vehicles for specified amounts;
>
> 5.   Whether the conduct of the Defendants and their co-conspirators, as alleged in the complaint, has cost those who could prove source of funds thousands in duplicative costs; and
>
> 6.   The appropriate class-wide measure of damages for the Classes.

114.   Defendant ACS is typical of the other dealers in the Class, in that their actions all arise

from the same operative facts and Plaintiffs' claims are based on the same legal theories.

115.    A class action is a superior method for the fair and efficient adjudication of this controversy. Management of the action as a class action is likely to present significantly fewer difficulties than those presented by any assertion of many individual claims or defenses. The identities of Class members can easily be obtained from Defendants' computerized and electronic records.

**CAUSE OF ACTION**
**VIOLATION OF SECT. 1 OF THE SHERMAN ANTITRUST ACT**
**(15 U.S.C. § 1, et seq.)**

116.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

117.    The Defendant dealerships and manufacturers are separate economic actors pursuing separate economic interests.

118.    Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially deflate the value that lessees can obtain from having a third-party fund the buyout their lease by allowing such only from or through the Defendant dealerships within the United States, its territories, and the District of Columbia in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) in that the Policy at issue is blatantly manipulating the prices of their leased and off-lease vehicles.

119.    Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by eliminating third-party funding of buyouts of new leased vehicles built by the Defendant manufacturers.

120.    The scheme outlined in this Complaint is a price fixing scheme that is a per se unreasonable restraint of trade.

121.    Defendants' conduct is manifestly anticompetitive because it eliminates price competition for the leased vehicle, while simultaneously reducing the supply of used cars on the open, free market.

122.    There is no competitive rationale for this scheme other than to secure dealers a supply of cars purchased below market value while also reducing supply to squeeze retail values higher.

123.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to restrict the trade in used vehicles built by the manufacturer by eliminating the value of the lessees' buyout option.

124.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Classes have been injured and damaged in an amount to be determined according to proof.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays for judgment as follows:

a.      A determination that this action may be maintained as both a plaintiff and defendant class action;

b.      All statutory damages available by statute;

c.      Treble damages as available by statute;

d.      Declaratory relief;

e.      All reasonable attorneys' fees, witness fees, expert fees, court costs and other litigation costs incurred by Plaintiff;

f.      Pre and post judgment interest; and

g.      Such other and further relief deemed just and appropriate by this Honorable Court.

## JURY TRIAL DEMAND

*Plaintiff hereby demands a jury trial as to all issues herein*

Respectfully submitted this 25th day of March, 2022.

S/ Joseph A. O'Keefe, Esq.
    Joseph A. O'Keefe, Esq.
    31 N. Tejon, Ste. 400
    Colorado Springs, CO 80903
    Phone: (719) 630-1556
    Email: joe@psokventurellc.com
    *Attorneys for Plaintiff*