**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-00740-CMA-MEH

PORTIA ADAMSON, on behalf of herself
and all others similarly situated,

      Plaintiff,

v.

VOLKSWAGEN GROUP OF AMERICA, INC.,
a New Jersey corporation, d/b/a AUDI OF
AMERICA, INC., VOLKSWAGEN AG, a
German corporation, and AUDI COLORADO
SPRINGS, on behalf of itself and all others
similarly situated,

      Defendants.

---

**DEFENDANT VOLKSWAGEN GROUP OF AMERICA, INC.'S
RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS THE COMPLAINT**

---

Recent supply chain constraints in the automotive industry have caused a temporary reduction of new motor vehicle inventory at dealerships, and a short-term increase in demand and prices for used motor vehicles. Aware of this dynamic, Plaintiff Portia Adamson ("Plaintiff") would like to sell a 2019 Audi that she does not own, but is merely leasing, to a buyer of her choosing and for her own profit. Purportedly denied this arbitrage opportunity, Plaintiff did not claim a breach of her lease agreement, nor initiate arbitration as required under that agreement. Instead, Plaintiff—a paralegal who works for Plaintiff's counsel—filed this case: a putative nationwide antitrust class action seeking treble damages on behalf of Audi lessees (which, according to Plaintiff, consists of more

than 100,000 people) against AOA and Audi Colorado Springs, the latter as a representative of a putative defendant class of approximately 300 independent, authorized Audi dealers.

In her Complaint (ECF #1), Plaintiff claims that AOA, its captive finance company (Volkswagen Credit, Inc.),[1] parent company (Volkswagen AG),[2] and all Audi dealers in the U.S. are engaged in a far-reaching conspiracy to prevent her, and Audi lessees like her, from exercising the early lease buyout option in their Audi lease agreements using "third party funds"—*i.e.*, selling the leased vehicle for cash or trade-in value to a buyer other than an authorized Audi dealer.

Plaintiff's claim is (at most) a narrow contract dispute, dressed up as a sprawling federal antitrust class action. The fit is a poor one. While Plaintiff asserts an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, she fails to invoke this Court's subject matter jurisdiction, describe a conspiracy that makes economic sense, or allege any facts to support the fundamental elements of her claim.

*First,* the Complaint does not allege that Plaintiff suffered any concrete injury-in-fact. It contains no allegations that Plaintiff had concrete plans or took concrete steps to prepare to exercise the early buyout option in her lease. Plaintiff therefore lacks Article III standing to bring this case, and the Court lacks subject matter jurisdiction to decide it.

*Second*, Plaintiff fails to plausibly allege that she suffered an antitrust injury or that she has antitrust standing to bring her claim. Plaintiff was not injured in her "business or

---

[1] Neither Volkswagen Credit, nor its subsidiary-lessor, Volkswagen Credit Leasing, Ltd., were named as defendants in the Complaint.

[2] Plaintiff dismissed Volkswagen AG as a Defendant in this action via a notice of dismissal filed May 26, 2022 (ECF # 23).

2

property," an essential element of statutory standing. She alleges harm only to herself, not to competition—the *sine qua non* of a Section 1 claim. She is not a participant in the Audi used car market, and thus not an "efficient enforcer" of the antitrust laws. And she alleges that the supposed restraint and its anticompetitive effects, if any, are merely temporary. Each of these defects prevents Plaintiff from establishing antitrust standing.

*Third*, Plaintiff fails to plausibly allege any *facts*, only unsupported conclusions, for the claim that AOA and Audi dealers entered into an *agreement* regarding buyouts of leased Audi vehicles. Under *Twombly*, Plaintiff's bare allegation that an agreement existed, without any facts to support it, is insufficient to state a claim.

*Fourth*, and finally, Plaintiff fails to plausibly allege a substantial anticompetitive effect in the relevant market, as she must under the applicable "rule of reason" standard, because she neither defines a legally sufficient relevant market nor pleads harm to competition in that market.

Each of these failures requires dismissal of Plaintiff's Complaint.

### CMA CIV. PRACTICE STANDARD 7.1D(a) STATEMENT

Counsel for AOA conferred with counsel for Plaintiff on May 20, 2022, to discuss AOA's motion to dismiss, at which time counsel for AOA informed counsel for Plaintiff of the bases for this Motion. Counsel for the parties held a further discussion regarding this Motion on June 7, 2022, at which time counsel for AOA again stated the bases for this Motion. Counsel for Plaintiff declined to consent to this Motion or to seek to amend its Complaint to address AOA's arguments.

US.350745829.01

## BACKGROUND

**I.** **The Parties and the Lease**.

AOA distributes new Audi vehicles in the United States through a network of authorized Audi dealerships. (*See* Compl. ¶ 18.) Audi Colorado Springs is an authorized Audi dealership. (Compl. ¶ 20.) Plaintiff is a Colorado resident. (Compl. ¶ 13.)

On October 18, 2019, Plaintiff leased a 2019 Audi A5 Sportback (the "Leased Vehicle") from Audi Denver, an authorized Audi dealership in Denver, Colorado, pursuant to a standard form lease agreement. (*See* Compl. ¶ 49; Ex. 1, Oct. 18, 2019 Closed End Motor Vehicle Lease at 1 (the "Lease")).[3] It was a typical vehicle lease transaction. Plaintiff did not purchase or acquire ownership of the Leased Vehicle, but rather contracted to use the Leased Vehicle for a period of months in exchange for monthly payments. (*See* Ex.1, Lease at 1 ("You [lessee] are leasing the Vehicle and have no ownership rights in the Vehicle unless you exercise your purchase option.") At the same time, Audi Denver sold the Leased Vehicle to VW Credit Leasing, Ltd. ("VCL" or "Lessor") and assigned the Lease to it. (Ex. 1, Lease at 1; 4, ¶ 25(n); 5, ¶ 27.)

The Lease provides Plaintiff, as lessee, the option to purchase the Leased Vehicle at set prices during or at the end of the Lease term:

> You have the option to buy the Vehicle at any time from a party designated by us. If you do, you agree to re-register and re-title the Vehicle in your name no later than 30 days from the time you purchase it. If you fail to do

---

[3] On a Rule 12(b)(1) or 12(b)(6) motion to dismiss, the Court may consider the "complaint itself . . . attached exhibits[,] and documents incorporated into the complaint by reference," *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir.2009), as well as "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted). *See also Masterpiece Cakeshop Inc. v. Elenis*, 445 F. Supp. 3d 1226, 1239 (D. Colo. 2019) (discussing these principles in the 12(b)(1) context). The Lease is clearly central to Plaintiff's claim and is referred to throughout the Complaint.

so, we reserve the right to cancel the registration. . . . Under this Lease, you will only he considered to have purchased the Vehicle if we assign the Vehicle's title directly to you.

(Ex. 1, Lease at ¶ 25(e).) But the Lease prohibits Plaintiff from assigning or attempting to assign the Lease or transferring the vehicle without Lessor's written permission. (*Id.* at ¶ 23, ¶ 25(m).) In other words, the *lessee* herself has a right to *purchase* the vehicle at set prices during or at the end of the Lease term, but may not assign this purchase right or sell the Leased Vehicle to anyone else.[4]

## II.    __Plaintiff's Allegations__.

The crux of Plaintiff's Complaint is a factually and legally baseless claim that Defendants conspired to prevent her from effectively selling the Leased Vehicle to a third party other than an Audi dealer, thereby decreasing the price she could receive for the Leased Vehicle, while supposedly increasing prices overall in the market for used Audi vehicles. (*See* Compl. ¶¶ 85-86.)

### A.    The Alleged Lease Buy-Out Policy.

According to the Complaint, at some point after entering the Lease, Plaintiff visited Audi Colorado Springs to learn about her Lease buy-out options. (Compl. ¶ 53.) Plaintiff alleges that when she visited the dealership, she learned—though she does not say from whom—that "Defendants would not allow third party funds to purchase and/or buy out the Lease and that Defendants would only allow an Audi dealership to buy out her Lease." (Compl. ¶ 54.) Plaintiff claims that this policy prevents her from arranging a transaction to

---

[4] The Lease provides that any dispute between the parties to the Lease arising out of or relating to the Lease, among other things, is subject to binding arbitration. (Ex. 1, Lease ¶ 26.)

transfer ownership of the Leased Vehicle to a third party for cash or to offset the cost of a different vehicle, which would avoid certain sales taxes (because there would only be one transaction, not two) and allow Plaintiff to realize "the benefit of the equity" in the Leased Vehicle. (*See* Compl. ¶¶ 47; 48; 68, 72, 74, 75, 80.) In other words, Plaintiff cannot sell or trade in the Leased Vehicle at a profit to a buyer of her choosing.

Although Plaintiff claims that "Defendants" generally are responsible for this restriction, neither AOA nor Audi Colorado Springs is a party to the Lease, had any role in the Lease, or own the Leased Vehicle (and thus do not determine to whom the vehicle may be sold). (*See* Compl. ¶ 54*; see generally* Lease.) Meanwhile, Plaintiff does not allege that she ever sought or obtained third-party funds to buy out the Lease, or that she contacted the Lessor to inquire whether she could. Nor does Plaintiff allege that she has any desire, intent or plan to purchase a used Audi vehicle (or any other used vehicle). (*See* Compl. ¶ 53.)

Nonetheless, Plaintiff claims that AOA; its parent company, Volkswagen AG; its "captive finance company" (*i.e.*, in Plaintiff's words, the manufacturer entity that is party to the Lease (VCL)) (*see* Complaint ¶¶ 29, 32, 34, 65; Ex. 1, Lease at 1); and all authorized Audi dealers, have formed a nationwide conspiracy to entrench this supposed restriction. Plaintiff variously asserts, among other things, that:

- "Defendants . . . have acted in concert to restrict the entry of off-lease Audi automobiles into the free, open used car market by . . . refusing to accept third-party funds on behalf of a Lessee once a payoff figure is obtained" (Compl. ¶ 3);

- "[ACS] and most Audi dealerships nationwide, if not all, knowingly conspired with the Volkswagen Defendants to restrain lease buyouts in exchange for various financial incentives" (Compl. ¶ 23);

6

- "the Defendant manufacturers – in conjunction with members of the ADDC and to 'jack up short-term profits' – implemented a strict nationwide policy . . . of not honoring third-party payoff funds" (Compl. ¶ 39); and

- "[D]efendants agreed, by words or conduct, to accomplish the unlawful goal of unreasonably restraining trade in the manufacturer's leased cars." (Compl. ¶ 68; *see also* Compl. ¶¶ 72, 74, 75, 81, 85-88, 92 (making similar conclusions)).

Plaintiff claims that the purpose of this supposed conspiracy is to funnel vehicles to Audi dealers to compensate for the limited availability of new vehicles in the current market (*see* Compl. ¶ 97)–*i.e.*, product shortages caused by supply chain issues reducing the availability of certain microchips. (*See* Ex. 6 (describing "a microchip-induced inventory shortage") (cited in footnote 5 of the Complaint).)

It is "indisputable," Plaintiff declares, that all Defendants "intentionally orchestrated" this policy shift (Compl. ¶ 97), citing six news articles from a trade publication for support. (*id.*; *see* Exs. 3-8.) Three of those articles, however, do not mention Audi or Volkswagen at all. (*See* Exs. 3, 4, 6, 8.) Among the other three, two do not mention lease buyout policies or practices. (Exs. 3, 5.) In fact, the only article that provides any information on Audi lease buyout policies includes a statement by Volkswagen Credit that it *does* allow non-franchised dealers to pay off (*i.e.*, buy out) lease contracts at a market-based price. (Ex. 7 at 3.) In addition, Plaintiff repeatedly quotes an alleged statement in one of the news articles from the head of Audi's Dealer Council to the effect that this policy was put in place to "jack up profits for the short term" (*see, e.g.,* Compl. ¶ 110; Ex. 2), but that article does not mention lease buy-out policies, and the snippet Plaintiff (inaccurately) quotes in fact *rejects* "jack[ing] up profitability in the short

US.350745829.01

term." (*See* Ex. 2 at 1 ("Anybody knows how to jack up profitability in the short term. Our business is sustainable long term with profitability that builds upon itself.").)

B. <u>The Alleged Market Impact</u>.

Plaintiff claims that this alleged scheme has effects in what amount to two markets. First, Plaintiff alleges that the supposed "no third-party buyout" policy artificially *decreases* the price Plaintiff could receive in the market for the Leased Vehicle (the "Audi Lease Buyout Market"), because she would only be able to sell that vehicle to an authorized Audi dealership, which in Plaintiff's telling, would offer her a below-market price. (*See, e.g.,* Compl. ¶¶ 68, 72, 74, 75, 80.) Second, Plaintiff alleges that the policy artificially *increases* prices in the retail market for used Audi vehicles (the "Audi Used Vehicle Market"), by funneling off-lease Audi vehicles to authorized Audi dealerships and/or restraining the supply of off-lease Audi vehicles in the Audi Used Vehicle Market. (*See* Compl. ¶¶ 77, 82-83.) Plaintiff alleges no *facts*, however, to support any of these suppositions.

Plaintiff claims that this alleged conspiracy constitutes an unreasonable restraint of trade. She brings a single count Complaint for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Act").

8

## LEGAL STANDARD

A motion to dismiss for lack of Article III standing challenges the Court's subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Colo. Envtl. Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004). Rule 12(b)(1) motions may present a facial or factual attack. *Muscogee (Creek) Nation v. Oklahoma Tax Comm'n,* 611 F.3d 1222, 1227 n.1 (10th Cir. 2010). On a facial attack, the Court considers the sufficiency of the Complaint as it would on a Rule 12(b)(6) motion. *Id.*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face.*" Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts will accept as true the well-pled factual allegations of a complaint, but not bare legal assertions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts are "not bound to accept as true a legal conclusion couched as a factual allegation," and plaintiffs cannot hide behind mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" in attempting to state a claim. *Id.* (citations omitted). When "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is warranted. *Twombly*, 550 U.S. at 558.

## ARGUMENT

### I.     Plaintiff Fails to Plead Article III Standing.

Plaintiff must show at the outset that she has constitutional standing to bring this action and thereby invoke the Article III jurisdiction of this Court. *See Muscogee*, 611 F.3d at 1227, n.1; *Twombly*, 550 U.S. at 570. The Complaint fails to allege facts supporting

US.350745829.01

this threshold requirement. The Court therefore lacks subject matter jurisdiction over this action and should dismiss Plaintiff's claim.

To establish constitutional standing under Article III, a plaintiff must demonstrate, among other things, that she has suffered "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992). A "concrete" injury "must be 'real' rather than 'abstract,'" and if not yet actual, then "certainly impending." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (cleaned up). If a plaintiff's injury is "speculative and conjectural," then "it is not 'concrete and particularized … actual and imminent.'" *Cochran v. City of Wichita*, No. 18-1007-JWB, 2018 WL 3772681, at *3 n.1 (D. Kan. Aug. 9, 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). Article III "requires a concrete injury even in the context of a statutory violation." *Laufer*, 22 F.4th at 876 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). "Thus, [o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 877 (quoting *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021)).

The Tenth Circuit's decision in *Laufer* illustrates these principles well. The plaintiff, Deborah Laufer, sued the owners of a hotel in Craig, Colorado, for violations of the Americans with Disabilities Act ("ADA"), alleging that the hotel's website violated certain ADA-based regulatory requirements. *Id.* at 874-75. She claimed that these violations "infringed her right to travel free of discrimination," and made it "more difficult to book a room at the hotel" or decide "whether the facilities at the hotel are accessible." *Id.* at 875.

US.350745829.01

She later supplemented her pleading with allegations that she visits Colorado "approximately once a year" and "intend[s] to travel all throughout the State." *Id.* The court held that these allegations were too speculative and abstract to establish injury-in-fact. Laufer failed to allege facts demonstrating any "concrete plans to visit Craig, Colorado, or to book a room" at the hotel, and therefore "did not suffer a concrete injury" that affected her "in a personal and individual way." *Id.* at 878 (citation omitted).

Plaintiff's allegations in this case fail for similar reasons. Plaintiff claims that she was injured by Defendants' purported refusal to "allow third party funds to purchase and/or buy out her lease," leaving her with no option to sell the Leased Vehicle except to Defendant ACS for "$3000 below average wholesale value." (Compl. ¶¶ 54, 56.) But Plaintiff does not allege that she ever sought, applied for, or obtained access to any third-party funds; that she ever asked AOA or the Lessor whether she could use third-party funds to buy out her Lease; that she made any offer to AOA or the Lessor to do so; or that AOA or the Lessor ever rejected such an offer. Nor does Plaintiff allege that she sought competing offers for the Leased Vehicle (even from other Audi dealers); that she was prevented from seeking or obtaining competing offers; or that she ultimately sold the Leased Vehicle for less than its purported "wholesale value." In short, Plaintiff fails to allege that she had "concrete plans" or took concrete steps to "realize the fair market value of [her] buyout option." *Laufer*, 22 F.4th at 876; (Compl. ¶ 102).

Plaintiff has failed to show, therefore, that she suffered any concrete injury-in-fact, whether actual or imminent, resulting from AOA's alleged violation of the Sherman Act. Plaintiff's purported injury is instead purely hypothetical, conjectural, and speculative.

US.350745829.01

Thus, the Complaint does not present a "case or controversy" sufficient to invoke the Court's Article III jurisdiction.

## II. <u>Plaintiff Fails to Plead Antitrust Standing</u>.

Plaintiff cannot maintain this action, even if she did plead injury-in-fact, because she did not suffer "antitrust injury" from supposed restrictions on her ability to sell the Leased Vehicle for a profit, and because she is not a consumer or competitor in the market for used Audi vehicles. Plaintiff therefore lacks antitrust standing for her claim.

Section 4 of the Clayton Act provides a private right of action for treble damages to "any person who shall be injured in *his business or property* by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a) (emphasis added). Despite this broad language, "a private plaintiff must have suffered an antitrust injury and must have standing to bring an antitrust claim." *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005). These requirements "are more rigorous than that of the Constitution." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006); *accord Host Int'l, Inc. v. Marketplace, PHL, LLC*, 32 F.4th 242, 249 (3d Cir. 2022) ("[T]he judicially imposed requirement of antitrust standing is far more limiting" than constitutional standing.).

To allege antitrust injury, a plaintiff must plead facts showing not only that she suffered an injury to her "business or property," but also that her injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Tal*, 453 F.3d at 1253 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Sherman Act is intended to prevent "corruption of the competitive process," *id.* at 1258; that is, to protect competition, not competitors,

*Crocs, Inc. v. Australia Unlimited, Inc.*, 2008 WL 4426170, at *3 (D. Colo. Sept. 25, 2008). When a plaintiff claims a violation of the Sherman Act, therefore, "[t]he antitrust injury requirement ensures that [it] can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Elliott Indus.*, 407 F.3d at 1124-25 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

But the existence of antitrust injury alone is not sufficient to create antitrust standing. Courts also must consider "whether the plaintiff is a proper party to bring a private antitrust action." *Tal*, 453 F.3d at 1253 (quoting *Assoc. Gen Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). A plaintiff must allege facts showing "a direct causal connection between [her] injury and [the] defendant's violation of the antitrust laws." *Tal*, 453 F.3d at 1253 (quoting *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003)); *see also Host Int'l*, 32 F.4th at 252 (plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers in the relevant market") (internal quotations and citation omitted); *Farnell v. Albuquerque Pub. Co.*, 589 F.2d 497, 501 (10th Cir. 1978) ("This prerequisite boils down to . . . proximate cause."). In other words, that she is an "efficient enforcer of the antitrust laws." *Crocs*, 2008 WL 4426170, at *3; *accord Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995) ("From the class of injured persons suffering an 'antitrust injury' only those parties who can most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4.") (citation omitted).

The Complaint alleges restraints on two purported markets: (1) the Audi Lease Buyout Market, and (2) the Audi Used Car Market. (*See* Background § II.B; Compl. ¶¶

13

68, 72, 74, 75, 77, 80, 82-83.) Plaintiff must allege that she suffered antitrust injury in, and is "the proper plaintiff[] to maintain an antitrust action with respect to[,] *each* of these markets." *Serfecz*, 67 F.3d at 597 (emphasis added).

In her Complaint, Plaintiff alleges that Defendants prevented her and other Audi lessees from selling their leased vehicles to non-dealer third parties, leading to lower cash or trade-in prices for Audi lessees in the Audi Lease Buyout Market, and "artificially inflated" retail prices for used car purchasers in the Audi Used Car Market. (*See, e.g.,* Compl. ¶¶ 68, 72, 74, 75, 80.) Plaintiff, however, lacks antitrust standing with respect to either market.

*First*, Plaintiff has no injury to her "business or property." 15 U.S.C. § 15(a). The Leased Vehicle is the *Lessor's* property, not Plaintiff's.[5] (Compl. ¶ 34; Ex. 1, Lease at 1 ("You . . . have no ownership rights in the Vehicle unless you exercise your purchase option").) Thus, even assuming Plaintiff's contractual right to "*buy* the [Leased] Vehicle" could be "property" under the statute (Ex. 1, Lease ¶ 25(e) (emphasis added)), Plaintiff has no similar right to *sell or transfer* the Leased Vehicle to a third party (*id.* ¶ 25(m) ("[y]ou may not assign the Lease or transfer the Vehicle without our prior written permission")), and therefore no injury to her "property" resulting from the alleged restraint. *See, e.g.*, *Tal*, 453 F.3d at 1254 ("[Plaintiff] cannot assert personal injury based on the condemnation of property he did not own.")

*Second*, Plaintiff alleges at most an injury to herself, not to competition in the Audi Lease Buyout Market. See *Elliott Indus.*, 407 F.3d at 1125 (plaintiff's injury as "royalty

---

[5] Plaintiff does not allege that she has suffered injury to any "business," nor could she so allege.

interest holder" from a market restraint that led to underpayment of royalties "is not an antitrust injury because it has no adverse effect on competition or consumers"). Indeed, she alleges nothing more than a breach of her contractual right to "buy the [Leased] Vehicle at any time" (Ex. 1, Lease ¶ 25(e)). "Antitrust plaintiffs cannot simply frame their contract claims in a clever way to pursue treble damages." *Host Int'l*, 32 F.4th at 253; *accord Procaps S.A. v. Pantheon, Inc.*, 845 F.3d 1072, 1087 (11th Cir. 2016) ("[S]ome antitrust cases are intrinsically hopeless because . . . they merely dress up in antitrust garb what is, at best, a business tort or contract violation.") (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 69 (1st Cir. 2004)); *SigmaPharm, Inc. v. Mut. Pharm. Co., Inc.*, 772 F. Supp. 2d 660, 674 (E.D. Pa. 2011) (no antitrust injury where "the source of [plaintiff's] right not to be deprived of royalties . . . is the contract with [defendant], not the federal antitrust laws") (*quoting Repp v. F.E.L. Publ'ns, Ltd.*, 688 F.2d 441, 447 (7th Cir. 1982)); *Arbitron Co. v. Tropicana Prod. Sales, Inc.*, 1993 WL 138965, at *12 (S.D.N.Y. Apr. 28, 1993) ("[C]ombining an assertion of general antitrust violation with a claim of injury from breach of contract or tort does not automatically make the latter a claim arising under the antitrust laws.") (quoting *Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1004 (2d Cir. 1970) (Friendly, J.)).

*Third*, Plaintiff is neither a purchaser or seller of used Audi vehicles—that is, neither a consumer nor a competitor—in the Audi Used Car Market. To the contrary, Plaintiff alleges that she visited ACS to "inquire" about "a fair trade on a *new* Audi," and excludes herself from the class of "*those persons* looking to purchase a used vehicle manufactured by the Defendants." (*Id.* ¶¶ 53, 82 (emphasis added).) Because Plaintiff is not a participant

US.350745829.01

in the Audi Used Car Market, she is not and cannot be an "efficient enforcer" as a matter of law. *SigmaPharm*, 772 F. Supp. 2d at 673-74 ("A proper antitrust plaintiff is an adversely affected market participant in the *restrained* market."); *Elliott Indus.*, 407 F.3d at 1125 (antitrust standing requires "that the injured party be a participant in the same market as the alleged malefactors"). In fact, Plaintiff's economic interest is *adverse* to preserving competition in the Audi Used Car Market. Plaintiff seeks to capitalize on "equity" in her Lease in the used vehicle *input* market; it necessarily follows, therefore, that *higher* prices in the used vehicle *output* market would increase her so-called "equity" in the Leased Vehicle. *See Adaptive Power*, 141 F.3d at 952 ("Antitrust claims must make economic sense.") (citing *Eastman Kodak Co. v. Image Technical Servs. Inc.,* 504 U.S. 451, 468 (1992)).

<u>Fourth</u>, Plaintiff's claim is merely that AOA (apparently through the Lessor) is "refusing to deal" with third-party buyers of leased Audi vehicles. That type of restraint does not harm competition as a matter of law. *See, e.g.*, *Westman Com'n Co. v. Hobart Intern., Inc.*, 796 F.2d 1216, 1229 (10th Cir. 1986) (Section 1 "does not proscribe refusals to deal absent a showing of monopoly or market power on the part of the manufacturer."); *Host Int'l*, 32 F.4th at 250 ("[A]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms and conditions of that dealing.") (quoting *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009)).

<u>Fifth</u>, and finally, Plaintiff lacks antitrust injury because she alleges, at most, temporary anticompetitive effects. "The Sherman Act is concerned only with conduct that has 'long-run anti-competitive effects.'" *JetAway Aviation, LLC v. Bd. of County Comm'rs*

US.350745829.01

*of County of Montrose, Colo.*, 754 F.3d 824, 841 (10th Cir. 2014) (Holmes, J., concurring) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)). Thus, "if the effect on competition is not more than temporary or 'transitory,' it is of no concern to the antitrust laws." *Id.* (citing *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co. of Am.*, 885 F.2d 683, 697 (10th Cir. 1989)); *see also Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (holding there is no antitrust injury absent allegations of "significant and *more-than-temporary* harmful effects on competition," and that the alleged four- to ten-month harm was temporary).

Plaintiff alleges that in September 2021, just six months before she filed this action, Defendants first adopted a "no third-party buyout" policy for leased Audi vehicles. (Compl. ¶ 39.) They did so, according to Plaintiff, for the purpose of "jack[ing] up *short-term* profits," and "to exploit *the current market*," which experienced an aberrational "microchip-induced inventory shortage" of new vehicles. (*id.* ¶¶ 39, 97, Ex. 6 (emphases added); *see also id.* ¶ 73 ("Dealerships are 'grounding' off-lease vehicles … at an unprecedented level to offset a purported 'scarcity' in used-vehicle inventory.").) Little wonder, then, why Plaintiff believes "in the *current* economy" she has "gained significant equity" in her Lease (*id.* ¶ 52 (emphasis added))—*i.e.*, a *temporary* shift in the balance of supply and demand. The Complaint thus alleges, at most, a temporary restraint adopted in response to transitory supply chain issues, not one that would impose "*more-than-temporary* harmful effects on competition." *Adaptive Power*, 141 F.3d at 952. Plaintiff therefore cannot plead antitrust injury and her claim must be dismissed.

US.350745829.01

**III.**     **Plaintiff Fails To Plausibly Allege An Agreement.**

The Complaint should be dismissed for the additional reason that it lacks plausible allegations of an unlawful agreement or conspiracy among Defendants.

Section 1 "does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553 (cleaned up). "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id.* (cleaned up); *see also Llacua v. W. Range Ass'n,* 930 F.3d 1161, 1174 (10th Cir. 2019) (same). A complaint therefore must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly,* 550 U.S. at 556; *see also Llacua,* 930 F.3d at 1172 n.20 ("Conclusory allegations are insufficient. Bare bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim. Moreover, the use of antitrust buzz words does not supply the factual circumstances necessary to support conclusory allegations.")

Plaintiff alleges no facts in the Complaint to support a plausible inference of agreement. AOA, its captive finance company, and its parent company, Volkswagen AG, comprise a single entity for antitrust purposes and thus cannot "conspire" as a matter of law. *See Copperweld*, 467 U.S. at 771 (1984); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1233-34 (10th Cir. 2017).

Moreover, Plaintiff's allegations of an agreement among AOA or its related entities, on the one hand, and authorized Audi dealerships, on the other, consist of nothing more than vague, unsupported legal conclusions accompanied by antitrust buzzwords. (*See*

US.350745829.01

Compl. ¶¶ 3, 23, 39, 68, 72, 74, 75, 81, 88, 92, 93.) The allegations ascribe an "agreement" to "Defendants" generally, but include no facts about who entered the alleged agreements; or where; or how. Likewise, there are no allegations of meetings, communications, or coordinated operations among Defendants to initiate or further the purported scheme. *See Twombly*, 550 U.S. at 567 n.10 (vague allegations of an agreement were insufficient where the complaint "furnishe[d] no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place").

Although Plaintiff cites six Automotive News articles as support for her vague allegation of an agreement, none of those articles contains even a hint of such support. (*See* Exs. 3-8). The only article related at all to lease buy-outs reports that Volkswagen Credit *permits* non-Audi dealerships to purchase leased vehicles. (Ex. 7.) That article is dated from September 2021, the same month that Plaintiff alleges the conspiracy began. (*Id.*; Compl. ¶ 39.) Worse still, Plaintiff repeatedly mischaracterizes one of the articles to claim that an Audi dealer admitted to using leasing policies to "jack up profits for the short term." (*E.g.* Compl. ¶¶ 23, 86, 110). But the article does not discuss leasing policies and the specific quote *disavows* "short term" business practices in favor of long term, sustainable profitability. (*See* Ex. 2 at 1.) The Complaint therefore fails to "nudge [Plaintiffs' claim] across the line from the conceivable to plausible." *Id.* at 570.

To the contrary, Plaintiff's own allegations show that the supposed conspiracy is *implausible*. Plaintiff alleges that Defendants conspired to reduce the price a lessee could obtain for a leased vehicle, funnel those leased vehicles to authorized dealerships, and

thereby "artificially[] increase the prices of *the Defendant manufacturers' used vehicles*" on the market (Compl. ¶ 77 (emphasis added).) But why would AOA and Audi dealers conspire to raise Audi used vehicle prices above market value, and thereby drive potential customers to other competing brands? *See Llacua*, 930 F.3d at 1181 (10th Cir. 2019) (finding implausible an "inference [that market participants] would participate in a conspiracy that locks in substantial advantages for their competition" and upholding dismissal where "the alleged conspiracy does not make economic sense"). Similarly, Plaintiff alleges that AOA provided "various financial incentives" to dealers to induce their participation in the scheme. (*See* Compl. ¶¶ 23, 86.) But if, as Plaintiff alleges, the scheme allowed Audi dealers to buy low and sell high—to "purchase these vehicles at a fixed price and then … resell them for [inflated] prices"—why would dealers need additional "financial incentives" to participate? (*See* Compl. ¶¶ 23, 86.) In short, Plaintiff's supposed conspiracy makes no economic sense.

## IV.     <u>Plaintiff Fails To Plausibly Allege Anticompetitive Effect</u>.

The Complaint should be dismissed for the additional reason that it fails to plausibly allege that any conspiracy among Defendants to restrain Plaintiff from selling the Leased Vehicle to a third-party buyer produced an anticompetitive effect in a relevant market.

The Complaint alleges a "vertical" restraint of trade: one "imposed by agreement between firms at different levels of distribution." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). AOA is a distributor of Audi vehicles; ACS and other Audi dealers are retail sellers of those products. (*See* Compl. ¶¶ 18, 20.) Vertical restraints, both price and non-

US.350745829.01

price, are analyzed under the rule of reason.[6] *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason."); *Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717, 724 (1988) (same for vertical non-price restraints); *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-CV-01241-JLK, 2010 WL 1416823, at *7 (D. Colo. Apr. 7, 2010).

In a rule of reason case such as this, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. at 2284; *see also Vincent v. Utah Plastic Surgery Soc.,* 621 F. App'x 546, 548 (10th Cir. 2015) (upholding dismissal under Rule 12(b)(6) where complaint "fail[ed] to sufficiently allege that Defendants' conduct had an anticompetitive effect in the relevant market"). Because Plaintiff fails to plausibly allege both a relevant market and anticompetitive effect, the Complaint should be dismissed for failure to state a claim.

A.    Plaintiff Fails to Plead a Legally Sufficient Relevant Market.

To state a claim under Section 1, a plaintiff must sufficiently allege a "relevant market," both in terms of a product market and a geographic market. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1117-18, 1120 (10th Cir. 2008). "The relevant product market in any given case is composed of products that have reasonable interchangeability for the purposes for which they are produced … [and] the plaintiff must justify any proposed market by defining it with reference to the rule of reasonable

---

[6] Plaintiff's bare conclusion that the claimed restraint is a *per se* violation of the Sherman Act (*see* Compl. ¶ 120) is insufficient and contrary to established law.

interchangeability and cross-elasticity of demand." *Buccaneer Energy*, 846 F.3d at 1313 (internal quotation marks and citations omitted). "The geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity with those included in the market." *Westman.*, 796 F.2d at 1222 (cleaned up). When a plaintiff's allegations fail to allege facts to support plausible product and geographic market definitions, "the relevant market is legally insufficient and a motion to dismiss may be granted." *Campfield*, 532 F.3d at 1118, 1120 (upholding dismissal of Section 1 claim) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir.1997)); *see also Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 08-CV-513, 2009 WL 2596493, at *6 (D. Colo. Aug. 21, 2009) (Arguello, D.J.) (dismissing Section 1 claim on same basis).

Plaintiff's Complaint completely fails to define any legally sufficient relevant product market. The Complaint takes no account of reasonable interchangeability or cross-elasticity of demand, focusing solely on the Audi brand and excluding the numerous other competing motor vehicles brands in the United States. The antitrust laws' "primary purpose is to protect *interbrand* competition," not intrabrand competition. *Leegin*, 551 U.S. at 878 (cleaned up); *see also Campfield,* 532 F.3d at 1119 (State Farm could not be liable for imposing a restraint of trade in the "State Farm insured windshield repair market."). Plaintiff's supposed single-brand (Audi) product markets take no account of interchangeability or cross-elasticity of demand, and therefore fail to satisfy the basic pleading requirements of her Section 1 claim, requiring dismissal. *Campfield*, 532 F.3d at 1118-20; *Total Renal Care,* 2009 WL 2596493, at *6.

22

Nor does Plaintiff even attempt to define a relevant geographic market. (*See* Compl. ¶¶ 72, 118, 123 (generally describing the market as that for used Audi vehicles, or off-lease used Audi vehicles).) For this reason too, Plaintiff's Complaint must be dismissed. *See Campfield,* 532 F.3d at 1118 (10th Cir. 2008) ("[D]efining a geographic market is a threshold requirement.") (quotation marks and citation omitted).

B.    Harm to Competition Is Implausible.

Plaintiff must also plausibly allege that the supposed conspiracy to restrain her from selling the Leased Vehicle to a third-party buyer has an anticompetitive effect in the relevant market. *Vincent*, 621 F. App'x at 548 (10th Cir. 2015). A plaintiff "may make this showing directly or indirectly. Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*, 138 S. Ct. at 2284 (cleaned up). "Market power is the ability to raise prices above those that would be charged in a competitive market," *Westman*, 796 F.2d at 1225 (citation omitted), and a plaintiff seeking to plead a defendant's market power must allege the defendant's market share. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991).

Because Plaintiff fails to allege a legally sufficient relevant market, she cannot plausibly allege anticompetitive effect in the relevant market, whether through direct or indirect evidence. *See Am. Express*, 138 S. Ct.*.* at 2285 ("Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy

23

competition.") (cleaned up). Moreover, the Complaint is devoid of facts from which the Court could infer that the alleged conspiracy affected competition in any conceivable relevant product market, such as the market for used vehicles. Plaintiff makes no allegation that the supposed agreement has reduced output, increased prices, or decreased quality in the broader market for used vehicles. Similarly, Plaintiff makes no attempt to plead that AOA or Defendants have market power in any market. For these reasons too, Plaintiff's Complaint fails to state a claim and should be dismissed. *See Vincent*, 621 F. App'x at 548.

## CONCLUSION

The Complaint fails to allege any facts to demonstrate that Plaintiff has Article III standing to assert a claim that AOA violated Section 1 of the Sherman Act, or to state such a claim against AOA. For these reasons, AOA respectfully requests that the Complaint be dismissed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Because Plaintiff had the opportunity but declined to seek to amend to address these defects, and because any such amendment would be futile, dismissal should be with prejudice.

24

Dated: June 17, 2022                    Respectfully Submitted,

VOLKSWAGEN GROUP OF AMERICA,
INC. d/b/a AUDI OF AMERICA, INC.

/s/ *Owen H. Smith*

Owen H. Smith
Nicholas W. Laird
Barack Ferrazzano Kirschbaum &
Nagelberg LLP
200 W. Madison Street, Suite 3900
Chicago, IL 60606
Tel: (312) 984-3100
Fax: (312) 984-3150
owen.smith@bfkn.com
nick.laird@bfkn.com

Jeffrey S. Roberts
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Suite 3400
Denver, CO 80202
Tel: (303) 607-3792
Fax: (303) 607-3600
jeff.roberts@faegredrinker.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2022, I sent a copy of the foregoing **RULE 12(b)(1) AND 12(b)(6) MOTION TO DISMISS THE COMPLAINT** to all counsel of record by filing said motion via the Court's electronic case filing system.

/s/ Carol Wildt_____

Carol Wildt, Legal Administrative Assistant