IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22–cv–00740–CMA–MDB

PORTIA ADAMSON, on behalf of herself and all others similarly situated,

    Plaintiff,

v.

VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation d/b/a AUDI OF AMERICA, INC., and
AUDI COLORADO SPRINGS, on behalf of itself and all others similarly situated,

    Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

**Magistrate Judge Maritza Dominguez Braswell**

    This matter is before the Court on the "Defendant Volkswagen Group of America, Inc.'s Rule 12(b)(1) and 12(b)(6) Motion to Dismiss the Complaint," filed by Defendant Volkswagen Group of America, Inc. d/b/a Audi of America, Inc. ["AOA"]. (["Motion"], Doc. No. 28.) Defendant Audi Colorado Springs ["ACS"] has filed a joinder in support of the Motion, Plaintiff Portia Adamson ["Plaintiff"] has responded in opposition to the Motion, and Defendants have replied. (["Joinder"], Doc. No. 29; ["Response"], Doc. No. 48; ["AOA Reply"], Doc. No. 49; ["ACS Reply"], Doc. No. 50.) For the reasons set forth below, the Court **RECOMMENDS** that the Motion be **GRANTED**.

## STATEMENT OF THE CASE

The crux of this putative class action is Defendants' purported scheme to stock up on used Audis by forcing Audi lessees to sell their Audis back to the dealership at below market value. This, according to Plaintiff, allows Defendants to reap the benefits of the current used-car-inventory shortage. In other words, Defendants are allegedly part of a scheme that allows Audi dealerships to 'buy low and sell high.' Plaintiff claims to have suffered injury in connection with this alleged scheme. In her Complaint, Plaintiff recounts the following:

- On October 18, 2019, she entered into a lease for the subject vehicle, a 2019 Audi, A5 Sportback 45 TFSI (2.0T) quattro ("The Audi"). (*Id.* at ¶ 49.)

- Plaintiff paid $450 for a purchase option that would allow her to buy The Audi either mid-lease or at the end of the lease term. (*Id.* at ¶¶ 35-38, 49-56.)

- Mid-lease, she noticed that the market for used Audis was strong, and she asked Defendant ACS about her options. (*Id.* at ¶¶ 52-54.)

- Plaintiff claims that at that time "she learned that Defendants would not allow third party funds to purchase and/or buy out her lease and that Defendants would only allow an Audi dealership to buy out the lease." (*Id.* at ¶ 54.)

- Plaintiff also learned that she could not obtain the payoff amount unless she went to the dealership. (*Id.* at ¶ 55.)

- Plaintiff claims that at that point she "was left with only one method to exercise her option – to sell it to Defendant ACS for an amount that was $3,000 below average wholesale value as reported by Manheim." (*Id.* at ¶ 56.)

2

In other words, Plaintiff counts herself among the many "lessees who cannot provide funds to purchase the vehicle to either (a) sit out this market, thus keeping their vehicle out of it, or (b) trade the vehicle for an average of $3,000 under Manheim wholesale value." (*Id.* at ¶ 80.)

The purchase option at issue provides:

> **Option to Purchase Vehicle**. You have the option to buy the Vehicle at any time from a party designated by us. If you do, you agree to re-register and re-title the Vehicle in your name no later than 30 days from the time you purchase it. If you fall to do so, we reserve the right to cancel the registration. Before the scheduled lease end, the price will be the Adjusted Lease Balance (see Item 24) plus the Item 9 Purchase Price minus the Item 7D Residual Value. At the scheduled lease end, the price will be the Item 9 Purchase Price. At either time, you must also pay the Additional Amounts Due and we will apply the Additional Credits to the amount you owe (see Item 25(s)). Under this Lease, you will only be considered to have purchased the Vehicle if we assign the Vehicle's title directly to you.

(Doc. No. 28-1 at ¶ 25(e).) Plaintiff notes that this provision does not restrict her "use of third-party funds to exercise this option," nor does it restrict "a lessee's subsequent assignment of title." (*Id.* at ¶¶ 59, 60.) Plaintiff alleges that by (1) withholding the payoff amount unless she visited the dealership, (2) prohibiting the use of third-party funds to buy out her lease, and (3) offering to buy out the lease, Defendants conspired to usurp "lessee equity/appreciation." (*Id.* at ¶¶ 69-70.) This, Plaintiff contends, is a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, because it is part of Defendants' overall scheme to direct a steady supply of used Audis from lessees back to Defendants and away from the competition. (*Id.* at ¶¶ 116-24.)

On June 17, 2022, Defendants responded to Plaintiff's allegations by filing this Motion and Joinder. (Doc. Nos. 28-29.) Defendants argue, among other things, that Plaintiff lacks Article III and antitrust standing to bring this case. (Doc. No. 28 at 9-17.) Specifically, Defendants argue that Plaintiff's purported injury is conjectural, abstract, and too speculative to constitute the requisite injury-in-fact required for Article III standing. (*Id.* at 11.) They argue that

3

Plaintiff also lacks antitrust standing because she has not suffered an injury to business or property of the type antitrust laws are intended to prevent. (*Id.* at 12.) Defendants also argue that Plaintiff fails to plausibly allege an agreement or conspiracy among the Defendants. (*Id.* at 18-20.) Defendant ACS also argues that the lease agreement itself requires dismissal, in part because it requires arbitration rather than litigation. (*See* Doc. No. 29.)

Plaintiff responds that, contrary to Defendants' arguments, she has indeed suffered a concrete injury because she took steps to exercise her purchase option. (Doc. No. 48 at 12.) She claims that Defendants frustrated her efforts and eliminated the intrinsic value Plaintiff held in her purchase option, which she describes as "the difference between the price the Defendant Dealers will pay and the fair market value." (*Id.*) In other words, Plaintiff argues that the injury, for purposes of Article III and antitrust standing, is the lost profit on her potential sale of the used Audi she leases. (*Id.*) According to Plaintiff, that injury was directly caused by Defendants' scheme, which produces anticompetitive effects because Defendants "are directing the flow of used Audis to the Defendant Dealers," and eliminating their competition by maintaining "a ready supply of used Audis to the exclusion of other dealers." (*Id.* at 14-20.)

## STANDARD OF REVIEW

I. **Federal Rule of Civil Procedure 12(b)(1)**

Federal Rule of Civil Procedure Rule 12(b)(1) empowers a court to dismiss a complaint for a lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case. Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)

(recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Id.* at 909. The dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). When considering a Rule 12(b)(1) motion, however, the Court may consider matters outside the pleadings without transforming the motion into one for summary judgment. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). If a party challenges the facts upon which subject matter jurisdiction depends, a court may not presume the truthfulness of the complaint's "factual allegations . . . [and it] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." [1] *Id*.

## II.   Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the

---

[1] In support of her Response, and to demonstrate the "required participation by Audi dealers in sales promotions and mandated terms for used car operations which go to the heart of Plaintiff's antitrust claims," Plaintiff submits a declaration from Jonathan Murphy, PhD, dated 7/25/2022. (*See* Doc. No. 48 at 11-12.) However, for purposes of this Court's standing analysis, the Court has focused on the "injury" inquiry, and has accepted as true all allegations concerning the Defendants' promotions, terms, and operations.

parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the Court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id*. at 679–81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

That being said, the Court need not accept conclusory allegations without supporting factual averments. *S. Disposal, Inc., v. Tex. Waste Mgmt.*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, the Court typically may not look beyond the pleadings. *Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010). "If, on a motion under Rule 12(b)(6), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020) (quoting Fed. R. Civ. P. 12(d)) (alterations omitted). "Pleadings," for purposes of a Rule 12(b)(6) motion to dismiss, include attachments to the complaint, documents incorporated into the complaint by reference, and information subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). Documents attached to a motion to dismiss are considered part of the pleadings, if they are referred to in the complaint, central to the plaintiff's claims, and not challenged as inauthentic. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997); *accord Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013).

Here, the Court has considered the lease agreement as part of its analysis because it is attached to the Motion, referred to in the Complaint, and central to Plaintiff's claim. Specifically, the lease forms the basis for Plaintiff's claim that she is entitled to some form of equity, and it contains the purchase option alleged to give rise to a property interest. No other document is necessary to the determinations made herein.

## ANALYSIS

Defendants make several arguments in favor of dismissal, one of which is central to both Article III standing and antitrust standing: lack of injury. Assuming without deciding that Defendants are indeed engaged in a scheme to direct a supply of used Audis away from their competition, and assuming that the purchase option at issue here supports that scheme by forcing—or at a minimum, inducing—lessees to sell their used Audis at below market value for Defendants' benefit, Plaintiff's claims are still subject to dismissal if there is no: (1) injury-in-fact sufficient for Article III standing, or (2) an injury to property, for purposes of antitrust standing. The Court will address each type of injury and standing, separately.

I.   **Article III Standing**

Article III standing requires that a plaintiff suffer "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, Defendants argue that Plaintiff's alleged injury is not sufficiently concrete to satisfy this requirement. In support of their argument, Defendants cite the Tenth Circuit's decision in *Laufer v. Looper*, 22 F.4th 871 (10th Cir. 2022). (Doc. No. 28 at 10-12.) In *Laufer*, plaintiff, Deborah Laufer, sued the owners of a hotel, located in Craig, Colorado, for violations of the Americans with Disabilities Act ("ADA"). 22 F.4th at 874. Ms. Laufer alleged the hotel's website violated certain ADA-based requirements. *Id.* at 874-75. She claimed that defendants "infringed her right to travel free of discrimination," and made it "more difficult to book a room at the hotel" or decide "whether the facilities at the hotel are accessible." *Id.* at 875. She also alleged that she visits Colorado "approximately once a year" and "intend[s] to travel all throughout the State." *Id.* The court

found these allegations failed to establish injury-in-fact because Ms. Laufer did not have any "concrete plans to visit Craig, Colorado, or to book a room." *Id.* at 878. Defendants argue the same is true here:

> Plaintiff does not allege that she ever sought, applied for, or obtained access to any third party funds; that she ever asked AOA or the Lessor whether she could use third-party funds to buy out her Lease; that she made any offer to AOA or the Lessor to do so; or that AOA or the Lessor ever rejected such an offer. Nor does Plaintiff allege that she sought competing offers for the Leased Vehicle (even from other Audi dealers); that she was prevented from seeking or obtaining competing offers; or that she ultimately sold the Leased Vehicle for less than its purported 'wholesale value.'

(Doc. No. 28 at 11.) Thus, according to Defendants, "Plaintiff fails to allege that she had 'concrete plans' or took concrete steps to 'realize the fair market value of [her] buyout option.'" (*Id.* (citing *Laufer*, 22 F.4th at 876).)

Plaintiff responds that the concrete injury requirement is satisfied because she plead the following:

- "that she bought the option for $450.00"
- "that she attempted to figure out the intrinsic value of this option by obtaining a payoff number; was told by Defendant Manufacturer that she could only obtain that information from a Defendant dealer;
- "that she went to a Defendant dealer to obtain the payoff and that she was told that only a Defendant dealer could exercise the option unless she had cash in hand with no third-party financing allowed."
- "Defendant dealer offered her a price below market value, and she chose to not enter that deal because it was not economically rational."

(Doc. No. 48 at 12.) Plaintiff argues, "[t]hose are concrete steps taken to exercise the option that was frustrated by the Defendants' conspiracy." (*Id.*)

The Court disagrees with Plaintiff. Nowhere in her Complaint does Plaintiff articulate concrete steps to secure third-party funds—which, based on Plaintiff's own allegations—is at the center of this dispute. (Doc. No. 1 at ¶¶ 3, 42, 54, 57-59, 70.) Plaintiff alleges that without third-

9

party funds, she and others who do not have cash-on-hand are precluded from reasonably exercising their purchase option. (*Id.* at ¶¶ 56, 89, 91.) Despite that allegation, Plaintiff does not allege that she made third-party financing arrangements, or even that she made concrete plans to line up third-party funds. Indeed, by her own admission, Plaintiff "went to a Defendant dealer *to obtain the payoff*," not to exercise her purchase option with third-party funds. (Doc. No. 48 at 12 (emphasis added).) Plaintiff's purported efforts to exercise her purchase option are at best inquiries about the purchase option. (*See* Doc. No. 1 at ¶ 54 ("When Plaintiff inquired of Defendant ACS about her options, she learned that Defendants would not allow third party funds to purchase and/or buy out her lease and that Defendants would only allow an Audi dealership to buy out the lease.").) Those efforts, like in *Laufer*, do not amount to the type of concrete plans required for injury-in-fact. If Plaintiff had taken steps to secure financing, or even inquired with third parties about the possibility of securing funds, she likely would have alleged that. And, while it is possible that this jurisdictional deficiency could be resolved by amendment, if the Honorable Christine Arguello accepts this Court's recommendation with respect to antitrust standing, any such amendment would be futile.

**II.     Antitrust Standing**

To establish antitrust standing, Plaintiff must allege that she suffered an injury to her "business or property," and that her injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The injury must be one that has an adverse effect on competition or consumers, not merely an injury to a competitor. *Elliott Indus. Ltd. v. BP Am. Prod. Co.*, 407

F.3d 1091, 1124-25 (10th Cir. 2005). The Court's inquiry into the nature of any alleged antitrust injury must be made "from the consumer's viewpoint," to ascertain whether the alleged conduct "affected the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 638 (10th Cir. 2008).

Notably, the standing requirement for an antitrust claim is "more rigorous than that of the Constitution." *Tal*, 453 F.3d at 1253. Furthermore, while antitrust injury and antitrust standing are overlapping concepts, they are nevertheless distinct. *Elliott*, 407 F.3d at 1124. An antitrust injury is required to establish antitrust standing, but the mere existence of an antitrust injury does not automatically confer standing. *Id.* Beyond simply considering whether there has been an injury, the Court must consider "whether the plaintiff is a proper party to bring a private antitrust action." *Tal*, 453 F.3d at 1253 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). Plaintiff must allege facts showing "a direct causal connection between [her] injury and [the] defendant's violation of the antitrust laws." *Tal*, 453 F.3d at 1253 (quoting *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003)); *see also Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 252 (plaintiff must "show that its loss comes from acts that reduce output or raise prices to consumers in the relevant market") (internal quotations and citation omitted); *Farnell v. Albuquerque Publ'g Co.*, 589 F.2d 497, 501 (10th Cir. 1978) ("This prerequisite boils down to . . . proximate cause."). That is, Plaintiff must be an "efficient enforcer of the antitrust laws." *Crocs, Inc. v. Austl. Unlimited, Inc.*, No. 07–cv–00221–MSK–MJW, 2008 WL 4426170, at *3 (D. Colo. Sept. 25, 2008); *accord Serfecz v. Jewel Food Stores*, 67 F.3d 591, 598 (7th Cir. 1995) ("From the class of injured persons suffering an 'antitrust injury' only those parties who can

most efficiently vindicate the purposes of the antitrust laws have antitrust standing to maintain a private action under § 4.") (citation omitted).

For the reasons set forth below, the Court finds Plaintiff does not have antitrust standing. First, the Court will explain why Plaintiff has not suffered injury to her business or property. Next, the Court will discuss antitrust standing more broadly, finding that even if Plaintiff did suffer some injury, her injury is removed from the alleged injury to competition, and is not the type of harm antitrust laws were meant to redress. *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1089 (D. Colo. 2012) (stating that, for purposes of antitrust standing, "the injury to the plaintiff and the injury to competition must be one and the same").

### A.   Plaintiff has not suffered an injury to property[2]

Plaintiff describes her property as the "purchase option contract," with an "intrinsic value . . . that is the difference between the price the Defendant Dealers will pay and the fair market value." (Doc. No. 48 at 12, 14.) Plaintiff argues that she suffered injury to property when:

> she attempted to figure out the intrinsic value of [her] option by obtaining a payoff number; was told by Defendant Manufacturer that she could only obtain that information from a Defendant dealer . . . she went to a Defendant dealer to obtain the payoff and…she was told that only a Defendant dealer could exercise the option unless she had cash in hand with no third-party financing allowed. Defendant dealer offered her a price below market value, and she chose to not enter that deal because it was not economically rational. Those are concrete steps taken to exercise the option that was frustrated by the Defendants' conspiracy.

(*Id.* at 12.) Plaintiff analogizes to *Waldron v. Brit. Petroleum Co.*, 231 F. Supp. 72 (S.D.N.Y. 1964). (*Id.* at 15.) In *Waldron*, the court found that a contract to buy Iranian oil was indeed

---

[2] Plaintiff does not allege that she is in the business of selling used Audis, or any other business that might be impacted by Defendants' conduct. Therefore, the Court analyzes the question of antitrust injury in the context of a potential injury to property, not an injury to business. *See Tal*, 453 F.3d at 1253 (finding that antitrust standing requires injury to the plaintiff's "business or property").

12

property for antitrust purposes. 231 F. Supp. at 86. Because the contract itself was "asserted to have been inherently valuable," the court found it was entitled to the protections afforded by the Clayton Act. *Id.* at 87.

Defendants contend *Waldron* is distinguishable because there were no contractual restrictions like the ones in place here. (Doc. No. 49 at 8 n.6.) Defendants also argue that here, Plaintiff's contract is for *purchase*, but Plaintiff is not alleging that Defendants conspired to prevent a *purchase*; instead, Plaintiff alleges that Defendants conspired to prevent the *sale* of the car and *assignment* of the lease. (*Id.* at 7-8 (quoting Doc. No. 28-1 at ¶¶ 23, 25(e), (m)).)

The Court agrees with Defendants. To the extent Plaintiff can claim a property interest in anything, it is in the purchase option itself. *Waldron*, 231 F. Supp. at 86-87. However, when Plaintiff paid for the purchase option, she paid for the right to buy The Audi subject to certain restrictions and requirements.[3] (Doc. No. 28-1 at ¶ 25(e).) One such requirement was that The Audi be assigned directly to Plaintiff. (*Id.* ("Under this Lease, you will only be considered to have purchased the Vehicle if we assign the Vehicle's title directly to you.").) Another requirement concerned the price Plaintiff would have to pay, as set forth in the option. (*Id.*) Additionally, pursuant to the lease agreement, Plaintiff was not permitted to assign the lease or transfer The Audi to anyone without the Lessor's written permission. (Doc. No. 28-1 at ¶¶ 23, 25(m).) Thus, the Lessor retained ownership rights in The Audi, and certain rights in connection with the lease and even the purchase option. This is critical because Plaintiff's theory centers on a mistaken belief that the $450 purchase option conferred upon her an unencumbered right to

---

[3] The Complaint does not allege that Plaintiff rejected the lease terms, or that she was fraudulently induced, or that Defendants failed to honor certain terms. (*See generally* Doc. No. 1.)

purchase The Audi, sell it, and collect the equity associated with The Audi. She assumes that if the value of The Audi increased, the value of her lease and/or purchase option automatically and commensurately increased too. (*See* Doc. No. 1 at ¶¶ 52-53, 75 (alleging Defendants eliminated "her ability to freely market her vehicle," and that the value of her lease appreciated because the market for used Audis was strong).) But the assumption that the lease is, in effect, a right to equity in the underlying asset betrays logic. It cannot be that the owner of the underlying asset *and* the lessee of the same asset, are both entitled to the same equity. Only one person can be entitled to the equity at any given time. *Currently*, Plaintiff does not have an ownership interest in The Audi itself. (*See* Doc. No. 28-1 at 1 ("You [lessee] are leasing the Vehicle and have no ownership rights in the Vehicle unless you exercise your purchase option."); Doc. No. 1 at ¶ 50 (admitting that "[a] lease is not a purchase, instead the lessee finances a percentage of the vehicle's Cap Cost . . . over a set period").) Thus, it follows that if The Audi appreciates in value, the *current* owner of The Audi is entitled to that appreciation, not Plaintiff.

Said another way, the only property Plaintiff owns is a $450 purchase option. That option is subject to certain restrictions and requirements, but Plaintiff continues to possess the right to exercise her option. If the current market has made the option less attractive to Plaintiff, or if she cannot exercise the option due to her own financial circumstances, she can choose not to exercise it,[4] but there has been no injury to her $450 property. Beyond the purchase option, Plaintiff has

---

[4] Indeed, Plaintiff admits she made that choice here. (Doc. No. 48 at 12 ("Defendant dealer offered [Plaintiff] a price below market value, and she chose to not enter that deal because it was not economically rational.") (emphasis added).)

14

no other property interest. Any value Plaintiff might have realized *after* exercising the purchase option is not "property" that can suffer injury.[5]

## B. Plaintiff's alleged injury is not the type of injury antitrust laws were intended to prevent

For the reasons set forth above, the Court finds Plaintiff's alleged harm—the inability to realize the so-called "equity" in her lease—is not injury to property. However, even if it were considered an injury to property, it would still be insufficient for antitrust standing because the alleged harm to Plaintiff is different from any alleged harm to competition, and it is not the type of harm antitrust laws were intended to prevent.

In *GDHI Marketing LLC v. Antsel Marketing LLC*, the plaintiff, a magazine publisher, alleged that the defendants (also publishers) "engaged in a campaign to drive [the plaintiff] out of the market," by making "false statements . . . about [the plaintiff] and its operation." 416 F. Supp. 3d 1189, 1195 (D. Colo. 2019). The plaintiff alleged that the defendants were engaged in the monopolization of the Denver market in violation of the Sherman Act. *Id.* at 1196. The defendants moved to dismiss all claims on various grounds, including on the basis that the plaintiff did not allege an antitrust injury. *Id.* at 1202. The court found that while "the Amended Complaint allege[d] that the antitrust injury suffered by the relevant consumers—home-improvement contractors—is that advertising prices 'have remained substantially higher than they would be,'" the plaintiff's alleged injury was different. *Id.* at 1203. The plaintiff allegedly suffered "lost revenues, lost business value, and potentially the destruction of its entire business,"

---

[5] For this reason, the Court agrees with Defendants that "Plaintiff has nothing to sell," and that Plaintiff "is at most a potential buyer of the Leased Vehicle," and therefore, *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219 (1948) is inapplicable. (*See* Doc. No. 49 at 8 n.7.)

15

but the court found that loss was "not an antitrust injury because it [had] no adverse effect on competition or consumers." *Id.* (citing *Elliott*, 407 F.3d at 1125).

Similarly, in *L-3 Commc'ns*, the plaintiff, L3, alleged that defendant Randall White, "devised a plan to leave L3 and create a competing business entity." 863 F. Supp. 2d at 1073. The plaintiff alleged that while Mr. White was employed by L3, he met "with L3's major customers to convince them to support his new, competing business, and he began using L3's internal acquisitions systems to purchase equipment that would later be diverted to the new business." *Id.* Eventually, Mr. White and his wife started a company called Jaxon Engineering and Maintenance, Inc. ("Jaxon"), and Mr. White allegedly continued "to acquire equipment through L3 with the intention of later transferring it to Jaxon." *Id.* Jaxon eventually obtained certain contracts "from Serco, one of L3's major clients,"[6] and L3 alleged "that these contracts were awarded as the result of collusion between Mr. White and Donald Eich, a Serco representative." *Id.* The plaintiff argued that the harm it suffered was directly related to, and indeed caused the harm suffered in the market. *See* Plaintiffs' Response to Motion to Dismiss First Amended Complaint and for a More Definite Statement at 60, *L-3 Commc'ns*, 863 F. Supp. 2d 1066 (D. Colo. 2012) (Doc. No. 50) ("Defendants restraint on trade deprived the market that consists of providing HEMP testing and maintenance to the U.S. government, of L-3's cutting edge technology and lower costs. Therefore, L-3 has shown that Defendants' actions caused

---

[6] Serco was a governmental contracting company that delivered information technology and management services to all branches of the U.S. military, federal civilian agencies, state and local government agencies, and commercial customers. Serco had an "Indefinite Delivery, Indefinite Quantity" contract with the United States government to provide testing and maintenance. Complaint, *L-3 Commc'ns*, 863 F. Supp. 2d 1066 (D. Colo. 2012) (Doc. No. 1), 2010 WL 4930658.

anticompetitive injury to the market."). But the court rejected plaintiff's argument. It found the alleged antitrust injury was different from the alleged injury to L3. *Id.* at 1090. As described by the court, the antitrust injury, on the one hand, was the "the harm suffered by the 'general public,'" which "resulted in the United States government having to pay more for services and product . . . than otherwise would have occurred." *Id.* at 1090. The injury to plaintiff, on the other hand, was the loss of business allegedly diverted away from plaintiff to Jaxon. *Id.* Thus, even though the injury to L3 was in some respects connected to the market injury, the attenuated connection was not enough to confer antitrust standing. *See id.* ("In short, L3 alleges that its own injury was an injury to it *as a competitor* [it did not receive orders that it was entitled to], but that injury is different from the alleged injury to *consumers* [that they paid higher prices for services].").

So too here. Plaintiff "pays lip service to an antitrust injury," but the Complaint "makes clear that the real injury [Plaintiff] seeks to vindicate is one suffered by [Plaintiff], not competition." *GDHI*, 416 F. Supp. 3d at 1203. What Plaintiff laments is that she is not able to access the equity in The Audi she is leasing. For the reasons set forth above, the Court believes Plaintiff is not entitled to equity in the underlying asset, but even assuming she is entitled to it, Plaintiff is at most an aggrieved party to a contract, or a pseudo-competitor squeezed out of the used Audi market—akin to the plaintiffs in *GDHI* and *L-3 Commc'ns*. Either way, however, the harm she alleges is not the type of harm antitrust laws were intended to prevent. *Elliott*, 407 F.3d at 1124-25.

In sum, the Court concludes that even if the alleged scheme has anticompetitive effects that potentially give rise to a violation of the Sherman Act or other antitrust laws, Plaintiff does

not have standing to bring those claims. On this basis then, the Court recommends granting the Motion, and dismissing this case without prejudice for a lack of subject matter jurisdiction.[7] *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir. 2006) (stating that the dismissal of a case for lack of subject matter jurisdiction should be without prejudice).

## CONCLUSION

For the reasons set forth herein, this Court respectfully **RECOMMENDS** that:

(1) "Defendant Volkswagen Group of America, Inc.'s 12(b)(1) and 12(b)(6) Motion to Dismiss the Complaint" (Doc. No. 28) be **GRANTED**.

(2) This case be **DISMISSED without prejudice** for lack of subject matter jurisdiction.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 E. 30th St., Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make

---

[7] The Court notes that Defendants have made other persuasive arguments, including that Plaintiff alleges *temporary* anticompetitive effects, that Plaintiff has failed to plausibly allege an agreement or conspiracy, and that the claim concerns intrabrand competition rather than interbrand competition. However, in the interest of efficiency and judicial economy, and because other arguments are dispositive, the Court does not address those arguments.

timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

**DATED**: January 12, 2023.

BY THE COURT:

_____
Maritza Dominguez Braswell
United States Magistrate Judge